# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| Wissem Ayoub, | |
| Plaintiff, | Case No.: 1:23-cv-01720 |
| vs. | **JURY TRIAL DEMANDED** |
| Trans Union, LLC, | |
| Defendant. | |

## COMPLAINT

Wissem Ayoub ("Plaintiff" or "Mr. Ayoub") a living, breathing 24-year-old consumer, brings this action on an individual basis, against Trans Union, LLC ("Defendant" or "Trans Union") for actual, statutory, and punitive damages and costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et. seq.*, arising out of Defendant's mixing Plaintiff's credit file with another consumer and inaccurately reporting Plaintiff as deceased.

## INTRODUCTION

1. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data

1

technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2. However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Bureau Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3. The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4. These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5. Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures

"to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6. "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

7. Congress made the following findings when it enacted the FCRA in 1970:

(1) The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

(2) An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

(3) Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

(4) There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy. 15 U.S.C. § 1681(a)(1-4).

8. Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and

equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter."  15 U.S.C. § 1681(b).  Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

9. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.
>
> *Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

10. Since 1970, when Congress enacted the Fair Credit Reporting Act, as amended, 15 U.S.C. § 1681 *et. seq.*, ("FCRA"), the federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

11. The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day

period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

12. In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

13. The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

14. A recurring and *known* issue within the credit reporting industry is the creation of "mixed files."

15. A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

16. "Mixed files" create a false description and representation of a consumer's credit history.

17. The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than

the Person who is subject to that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

18. Mixed files are not a new phenomenon. Defendant has been on notice of the existence of mixed files, and the fact that its procedures for creating credit files, including its matching algorithms, are prone to frequently cause mixed files, for over thirty (30) years. *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

19. More recently, Defendant has been the subject of numerous state attorney general actions relating to its mixed file problem.

20. For example, in 2015, the New York Attorney General filed charges and settled claims with Defendant over mixed files.[1] *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC.*

21. Notwithstanding Defendant's notice and being subject to repeated enforcement actions, mixed files continue to occur despite consumers' unique personal identifying information, such as Social Security numbers, date of birth, and addresses.

22. Another consequence of mixed files is the resulting disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both. This occurs when a consumer's file is mixed with that of another consumer, and either of those consumers applies for credit, housing, insurance, or employment, and Defendant sells information pertaining to one consumer in response to the application of the other.

23. Defendant has been sued thousands of times wherein an allegation was made that Defendant violated the FCRA. Moreover, Defendant is sued, at a minimum, hundreds of times each year wherein an allegation is made that Defendant mixed a consumer's credit file with that of another consumer.

24. FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

25. This court has previously found that Defendant's reinvestigation procedures violate the FCRA. *Mullins v. Equifax Info. Servs. LLC,* 2:05CV888-REP (E.D. Va.).

26. For example, in 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case NO. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes. The jury awarded Ms. Thomas $300,000.00 in actual damages and $5,000,000.00 in punitive damages. Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

27. In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000.00 in actual damages and $2,700,000.00 in punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes. Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

28. In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000.00 in actual damages and

more than $18,000,000.00 in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Miller' numerous disputes.  Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

29. More recently, a jury assessed a $60 million dollar verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone.  *See Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *aff'd in part, vacated in part, rev'd in part sub nom*.  *Ramirez v. TransUnion, LLC*, 951 F.3d 1008 (9th Cir. 20020). Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

30. "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong evidence is required to cure the defendant's disrespect for the law."  *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA).  Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully.  *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

31. No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

32. Notably, the Federal Trade Commission has specifically warned consumer reporting agencies, including Trans Union, to review their procedures when a mixed file occurs.

33. Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

34. Plaintiff's claims arise out of the Defendant's blatantly inaccurate credit reporting, wherein Defendant reported to Plaintiff's potential creditor(s) that Plaintiff is "deceased" and does not have a credit score because Defendant mixed Plaintiff's credit file with that of a deceased consumer.

35. Accordingly, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

36. As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from the Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## **PARTIES**

37. Wissem Ayoub ("Plaintiff" or "Mr. Ayoub") is a natural person residing in Arlington, Virginia, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

38. Defendant Trans Union, LLC ("Defendant" or "Trans Union") is a corporation with a principal place of business located at 555 West Adams Street, Chicago, IL and can be served at their registered agent address at 807 Adlai Stevenson Drive, Springfield, IL 62703, and is authorized to do business in the State of Virginia, including within this District.

39. Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

## JURISDICTION AND VENUE

40. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

41. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

42. The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

43. The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

44. Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel,

insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

45. To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

46. The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

**Defendant's Processing of Credit Information**

47. Defendant regularly receives information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

48. These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

49. Defendant collects information from thousands of furnishers.

50. The process by which Defendant receives, sorts, and stores information is largely electronic.

51. Furnishers report credit information to Defendant through the use of coded tapes that are transmitted to Defendant on a monthly basis through software known as Metro 2.

52. Defendant takes credit information reported by furnishers and creates consumer credit files.

53. Defendant maintains credit files on more than 200 million consumers.

54. Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to within the industry as "tradelines").

### Defendant's Mixed File Problem

55. Defendant knows that different consumers have similar names.

56. Defendant knows that different consumers can have similar Social Security numbers.

57. Defendant knowns that different consumers with similar names can also have similar Social Security numbers.

58. Defendant knows that public records often do contain identifying information such as Social Security numbers or dates of birth.

59. Defendant matches tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or public record to the information they maintain about the consumer in the consumer's credit file or files.

60. Defendant accomplishes this matching of credit information to consumer credit files through the use of certain matching algorithms or database rules.

61. From time to time, Defendant's matching algorithms match information belonging to one consumer to the credit file of another consumer; resulting in what's commonly known as in the credit reporting industry as a mixed or merged credit file.

62. Mixed files are not a new phenomenon. In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged with enforcement of the FCRA), entered into individual Consent Decrees with each of the major CRAs, specifically

including Defendant, regarding its significant failures and deficiencies with respect to mixed files.

63. Despite Defendant's long-standing and specific knowledge of the mixed file problem, Plaintiff's credit report was still generated by Defendant containing information belonging to another consumer.

64. A mixed or merged credit file is the result of Defendant's inaccurately mixing personal identifying information and credit information and/or an entire credit file belonging to one consumer into the credit file of another consumer.

65. There are many different possible causes for the mixing of credit files but all of them relate in one way or another to the algorithms and/or database rules used by Defendant to match personal identifying information and credit information, including public record information, to a particular consumers' credit file.

66. The success or failure of these algorithms or rules is both a function of the rules themselves and of the information provided by the furnishers of the tradeline information to Defendant.

67. A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal "indicative" information (e.g., name, Social Security number, address, date of birth, etc.) by the furnishers to Defendant.

68. Accordingly, the database rules determine which credit files are selected by the algorithm and merged to create a complete consumer report.

69. Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer credit files belonging to different consumers into one consumer report.

**Defendant's Practices Concerning the Sale of Reports on the "Deceased"**

70. Defendant sells millions of consumer reports (often called "credit reports" or "reports") per day, and also sells credit scores.

71. Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendant, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

72. Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Defendant, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

73. Defendant routinely places a "deceased" notation or marking on reports when it is advised by any of its many data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

74. Defendant's furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" or "U/UNDESIGNATED" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

75. Defendant does not request or require a death certificate from any of their data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

76. Defendant does not request or require any proof from any data source which advises that a consumer is "deceased," showing that the consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

14

77. Defendant does not independently verify with any source that a consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

78. In some cases, in order to assure accuracy, Defendant may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado.

79. Defendant does not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" or "U/UNDESIGNATED" deceased code is furnished to them to be placed in said consumer's credit file or report.

80. The Social Security Administration (SSA) maintains the **Death Master File ("DMF")**.

81. The DMF is made available by the Department of Commerce's National Technical Information Service (NTIS) through a **public file of death information**, which *excludes* state death records.

82. NTIS sells the public file of death information, also known as the public Death Master File (DMF) or Limited Access DMF, to other agencies and private organizations such as banks and credit companies in accordance with the requirements of section 203 of the Bipartisan Budget Act of 2013.

83. The DMF is also known commercially as the Social Security Death Index (SSDI).  The SSA's DMF as of 2018 contained information on 111 million deaths that have been reported to the SSA.

84. The DMF is created from internal SSA records of deceased persons possessing social security numbers and whose deaths were reported to the SSA.  The DMF includes the following information on each decedent, if the data are available to the SSA: social security number, name, date of birth, and date of death.

85. Legislation (i.e., the Social Security Act) precludes the sharing of the full DMF with non-benefits paying agencies.

86. Because of the wide use and demand for death records for a variety of industries, SSA has partnered with the U.S. Department of Commerce's National Technical Information Service (NTIS) to release the **Limited Access Death Master File (LADMF)** electronically on a weekly and monthly basis.

87. The SSA receives death reports from many sources, including family members, funeral homes, financial institutions, postal authorities, state information, and other federal agencies.

88. The SSA does not have a death record for all persons; therefore, the SSA does not guarantee the veracity of the DMF.

89. The SSA does not guarantee 100% of the data.

90. The SSA estimates that roughly 12,000 living people are added to the DMF annually, potentially due to clerical error. An erroneous listing can lead to not only a cessation of government benefits, but also the freezing of bank accounts, the inability to buy or rent property, and mistaken accusations of identity theft.[2] [3]

91. The Office of the Inspector General called the error rate "very low," but noted that "SSA's erroneous death entries can lead to mistaken benefit terminations and cause severe financial

hardship and distress to affected people…when errors like this occur, it can be a long and difficult process to resurrect your financial health.[4]

92. Defendant does not have access to the full DMF from the SSA, but rather are subscribers to the NTIS LADMF.

93. Despite being a subscriber of the NTIS LADMF, Defendant does not cross-reference the "X", or "U/UNDESIGNATED" code received from data furnishers with the LADMF in order to determine whether any given consumer reported as deceased via a furnishing source is also on the LADMF *before* selling a credit report about said consumer, or at any time.

94. Defendant will only cross-reference the NTIS LADMF to sell additional products for an additional fee to its subscribers regarding information contained within the LADMF.

95. Defendant fails to employ reasonable procedures that assure that a consumer is in fact actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

96. Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendant does not employ any procedures to assure that a consumer is in fact actually deceased before placing the "deceased" mark in that consumer's file.

97. Even in instances where the purportedly deceased consumer communicates directly with Defendant, Defendant does not employ any procedures to assure that a consumer is in fact actually deceased before placing the "deceased" mark on that consumer's report.

98. Once a "deceased" mark is placed upon a consumer's report, Defendant will not calculate and will not provide a credit score for that consumer.

99. Upon Defendant's reports with a "deceased" mark sold to third parties, Defendant never calculates or provides a credit score for that consumer and instead reports that consumer's credit score as "N/A."

100. Defendant knows that third party credit issuers require a credit score in order to process a given credit application.

101. Defendant knows that consumers without credit scores are unable to secure any credit from most credit issuers.

102. Defendant knows that living consumers are routinely turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

103. Defendant has been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because Defendant is inaccurately reporting them as "deceased" and without a credit score.

104. Defendant has received and documented many disputes from consumers complaining that Defendant had erroneously marked them as "deceased" on their credit reports.

105. Defendant knows that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing of the "X" or "U/UNDESIGNATED" code.

106. Nevertheless, Defendant does not employ any procedures to assure that a consumer is actually deceased before adding a "deceased" notation to that consumer's credit file and credit reports.

107. Even consumers who dispute the erroneous "deceased" status on their credit reports continue to be erroneously marked as deceased unless the furnishing source which

provided the erroneous "X" or "U/UNDESIGNATED" code in the first instance modifies its reporting first.

108. Defendant does not have any independent procedure to change an erroneous deceased status on its own and will merely parrot its furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

109. Nor does Defendant employ any procedures to limit or stop the furnishing of reports to third parties for consumers that it has marked as "deceased" under any circumstances.

110. For years after a consumer's actual death, Defendant will continue to sell credit reports about that consumer.

111. Defendant will only remove a deceased consumer's file from its respective credit reporting databases when it is no longer valuable to it — meaning that no one is continuing to purchase reports about that consumer.

112. Defendant charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

113. Defendant profits from the sale of reports on deceased consumers.

114. Defendant has in its respective credit reporting databases many "deceased" tradelines corresponding to distinct credit files for individual consumers that it has marked as "deceased."

115. Defendant knows that truly deceased consumers do not apply for credit.

116. Defendant knowns that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the

personal identifying information of deceased consumers is known to Defendant to be a common and major source of identity theft.

117. Defendant knows that identity theft and credit fraud are serious and widespread problems in our society.

118. Defendant warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and require relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

119. Defendant has no similar death certificate, executorship paper, or any other proof requirements for their data sources, which report a consumer as deceased or for the purchasers of their reports who access the purportedly deceased consumer's information.

120. Defendant sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

121. For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for Defendant to sell their credit reports, absent a court order.

122. Defendant knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

**Plaintiff Applies for Insurance with National General**

123. In or about February 2023, Plaintiff was interested in switching his car insurance to a more affordable option.

124. On February 20, 2023, Plaintiff completed and submitted an insurance application with National General Insurance.

125. For National General Insurance ("National General") to make a determination on Plaintiff's credit application, it would need to obtain copies of his credit files. Plaintiff provided National General with his personal identification information, including his name, date of birth, Virginia driver's license, and passport number, and authorized it to obtain copies of his credit files.

126. On February 20, 2023, Defendant sold a credit report about Plaintiff to National General in response to Plaintiff's insurance application.

**National General Denies Plaintiff's Application for Car Insurance.**

127. On February 20, 2023, the National General issued an Adverse Action Notice to Plaintiff in response to his application for insurance.

128. Specifically, National General's adverse action notice provided the following reason for denying Plaintiff's credit application: "Credit returns Subject Deceased. Contact TransUnion."

129. Defendant's reporting was grossly inaccurate: Plaintiff is not deceased.

130. The credit file provided to National General by Defendant was patently false on its face – Defendant reported Plaintiff as "deceased," and likely also failed to return a credit score for Plaintiff because Defendant had a deceased notation on Plaintiff's credit file.

131. Defendant's deceased notation was patently incorrect because Plaintiff is alive.

132. It was inaccurate for Defendant to publish information to a third party indicating that Plaintiff was deceased when Plaintiff was in fact alive.

133. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

**Plaintiff's Mixed Credit File as of February 2023**

134. Shocked, worried, and confused, Plaintiff didn't know what to do next.  The insurance denial took him by surprise. Specifically, any notion by Trans Union that Plaintiff was deceased was particularly baffling to Plaintiff.

135. Sometime on or about October 12, 2023, Plaintiff secured a copy of his credit file from Defendant.

136. Upon reviewing the contents of the October 12, 2023, credit file, Plaintiff was even more confused because he could not find any information on the report to explain why Trans Union thought he was deceased.

137. Even more confusing was the appearance of information that did not belong to Plaintiff at all.

138. Specifically, Defendant was reporting the following social security number which did not belong to Plaintiff: XXX-XX-6008.

139. Plaintiff did not have a social security number, much less one ending in 6008.

140. Plaintiff is a foreign exchange student living in the US on a Visa.

141. Plaintiff did not have a social security number until on or about October 30, 2023.

142. By reporting the social security number in the credit file presumably about Plaintiff, despite the fact that the social security number does not belong to Plaintiff, Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

**Plaintiff's November 2021 Dispute to Defendant**

143. On or about November 16, 2021, worried that something was very wrong with his credit file, Plaintiff sent a dispute letter to Defendant, via certified mail, and disputed the inaccuracies.  Specifically, Plaintiff disputed Defendant's reporting to National General that he was "deceased" in response to his credit application.

144. Along with his dispute letter, Plaintiff enclosed a copy of his driver's license and social security card to better assist Defendant in identifying him in its system.  Plaintiff also provided a copy of his National General credit denial which clearly stated that National General denied his credit application because Defendant had reported him as "deceased."

145. Plaintiff requested that Defendant reinvestigate the disputed information, correct the reporting, and send him a corrected copy of his credit report.

146. Plaintiff thought that disputing the deceased code would lead to the ultimate correction of his credit file, and removal of the other, likely deceased consumer's information from his credit file.

**The Credit Bureaus' Method for Considering Consumer Credit Report Disputes**

147. The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

148. The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

149. That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

150. It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

151. Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

152. Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

153. The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

154. These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

155. Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

156. The data furnishers then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

157. Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**Defendant's Unreasonable Dispute Reinvestigation**

158. Plaintiff never heard back from Defendant regarding his dispute.

159. Defendant failed to conduct a reasonable investigation of Plaintiff's November 2021 dispute, or any reinvestigation whatsoever, to determine whether the disputed information was inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

160. Thereafter, and upon information and belief, Defendant failed to correct or delete the deceased notation appearing in Plaintiff's credit report and continued to report him as deceased.

161. Further, and upon information and belief, Defendant failed to unmix Plaintiff's credit file from that of the likely other deceased consumer and likely Defendant continued to report the other, likely deceased consumer's information to Plaintiff's credit file.

162. As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

163. Upon information and belief, Defendant failed to unmix Plaintiff's credit file from that of the likely other deceased consumer and likely Defendant continued to report the other, likely deceased consumer's information to Plaintiff's credit file.

164. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

165.Upon information and belief, because Defendant continues to mix Plaintiff's credit file with that of the unrelated consumer, Defendant continues to sell Plaintiff's credit file in response to applications and inquiries pertaining to the unrelated consumer.

166.As a result of the "deceased" notation, Defendant made it practically impossible for Plaintiff to obtain credit.

167.At all times pertinent hereto, Defendant was acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

168.At all times pertinent hereto, Defendant's conduct, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

169.As a standard practice, Defendant does not conduct independent investigations in response to consumer disputes.  Instead, it merely parrots the response of the credit furnisher, despite numerous court decisions admonishing this practice.  *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

170. Defendant is aware of the shortcomings of its procedures and intentionally chooses not to comply with the FCRA to lower its costs.  Accordingly, Defendant's violations of the FCRA are willful.

171. As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information mixed into Plaintiff's credit file.

## CLAIMS FOR RELIEF

### COUNT I

### 15 U.S.C. § 1681e(b)

### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

### (First Claim for Relief Against Defendant Trans Union)

172. Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

173. The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

174. On at least one occasion, Defendant prepared patently false consumer reports concerning Plaintiff.

175. Despite actual and implied knowledge that Plaintiff is not dead, Defendant readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

176. Defendant mixed another, likely deceased consumer's personal and credit account information into Plaintiff's credit file, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

177. Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

178. As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental

and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information, mixed into Plaintiff's credit file.

179. Defendant's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

180. Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i. Determining that Defendant negligently and/or willfully violated the FCRA;

ii. Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii. Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv. Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

**Respectfully Submitted,**

**Wissem Ayoub,**

/s/
Susan Mary Rotkis
VSB 40693
AZ Bar 032866
Consumer Attorneys
2290 East Speedway Blvd.
Tucson, AZ 85719
T:602-807-1504
F: 718-715-1750
E: srotkis@consumerattorneys.com

*Attorneys for Plaintiff*
*Wissem Ayoub*